# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 5, 2004 Session

## CITY OF CHATTANOOGA v. CINEMA 1, INC., ET AL.

**Appeal from the Chancery Court for Hamilton County**
**No. 02-1229     Howell N. Peoples, Chancellor**

**FILED APRIL 13, 2004**

**No. E2003-01038-COA-R3-CV**

David Franklin ("Franklin") operates an adult bookstore in Chattanooga known as Cinema 1, Inc. ("Cinema 1"). Numerous undercover visits by Chattanooga Police Department officers discovered a significant amount of sexual activity happening at Cinema 1. This sexual activity violated the Chattanooga city ordinance regulating adult oriented establishments. Based on police reports detailing what the undercover officers observed at Cinema 1, the Mayor of Chattanooga revoked Franklin's adult oriented establishment license, a decision later affirmed by the Chattanooga City Council and then the Trial Court. The primary issues on appeal concern whether the Chattanooga ordinance regulating adult oriented establishments provides the necessary procedural safeguards required by the First Amendment to be considered facially constitutional under the federal Constitution. We conclude the licensing scheme provides the necessary First Amendment procedural safeguards. We further conclude that there was sufficient evidence presented to revoke Franklin's license. The judgment of the Trial Court, therefore, is affirmed.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the
### Chancery Court Affirmed; Case Remanded

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS and CHARLES D. SUSANO, JR., JJ., joined.

H. Louis Sirkin, Jennifer M. Kinsley, Cincinnati, Ohio, John Herbison, Nashville, Tennessee, and Arvin H. Reingold, Chattanooga, Tennessee, for the Appellants Cinema 1, Inc., and David Franklin.

Phillip A. Noblett and Jennifer T. Flowers, Chattanooga, Tennessee, for the Appellee City of Chattanooga.

# OPINION

## Background

Franklin has been issued successive one-year licenses by the City of Chattanooga (the "City") which have allowed him to operate an adult oriented business since 1993. Franklin's most recent license was to expire on November 18, 2002. Approximately ten days before this license expired, Franklin was informed that the license was being permanently revoked effective November 18 and the reasons for the revocation. The revocation of Franklin's license was upheld by the Chattanooga City Council and then the Trial Court. On appeal, Franklin and Cinema 1 ("Defendants") argue that various portions of the Chattanooga City Code regulating adult oriented establishments are facially unconstitutional and ask this Court to declare the entire licensing scheme invalid. Alternatively, Defendants claim there was insufficient evidence to support revocation of the license.

The portion of the Chattanooga City Code ("City Code") regulating adult oriented establishments is Article XIV.[1] The stated purpose of this Article is, among other things, to "promote and secure the general welfare, health, and safety of the citizens of the City of Chattanooga." Article XIV was passed after findings were made by the City Council that sexual activity and prostitution were occurring at adult oriented establishments. Sections 11-423 through 11-428 of Article XIV require all operators of adult oriented establishments to obtain a license and for all employees of these establishments to obtain permits. These sections also set forth the requirements that must be met in order to obtain the necessary license or permit. Section 11-435 prohibits unlawful sexual acts from taking place at any adult oriented establishment. This section states, *inter alia*, that no operator, entertainer, or employee of an adult oriented establishment shall "permit to be performed, offer to perform, perform or allow customers, employees or entertainers to perform sexual intercourse or oral or anal copulation or other contact stimulation of the genitalia." This section also prohibits employees, customers, etc., from exposing their genitals.

When a license to operate an adult oriented establishment is sought, the applicant is required to complete an application and provide certain information, such as whether the applicant has a criminal record, etc. The applicant also is required to provide information about the proposed establishment, such as where the business will be located. As previously noted, every employee of an adult oriented establishment is required to obtain a permit. The procedure for obtaining a permit is essentially the same as the licensing procedure and requires completion of an application. Once an application for a license or a permit is filed, the Chattanooga Police Department ("CPD") is required to conduct an investigation into the qualifications of the applicant. For both license and permit applicants, the results of CPD's investigation "shall be filed in writing with the city treasurer" no later than twenty days after the date of the application. § 11-425(b)(for licenses); § 11-428(b)(for permits).

---

[1] Any references in this Opinion to the City Code refer only to Article XIV.

The next step in the procedure is found at § 11-424(c) for licenses and §11-427(c) for permits. For all intents and purposes, these sections contain identical language. Section 11-424(c) provides:

> Within ten (10) days of receiving the results of the investigation conducted by the Chattanooga Police Department, the city treasurer shall notify the applicant that his application is granted, denied or held for further investigation. Such additional investigation shall not exceed an additional thirty (30) days unless otherwise agreed to by the applicant. Upon conclusion of such additional investigation, the city treasurer shall advise the applicant in writing whether the application is granted or denied.

The City Code also contains a procedure for current license or permit holders who are seeking to renew their license or permit for a new one-year period. An application for renewal must be filed no later than sixty (60) days before expiration of the current license/permit. The renewal application is sent to CPD. If CPD is aware of any information bearing on the operator's/employee's qualifications, this information "shall be filed in writing with the city treasurer." §§ 11-431(c) and (f). An application for renewal of a license or permit "shall be handled, investigated and approved or denied within the same time periods as those established in this Article for original license applications and permit applications.…" § 11-431(g).

The City Code provides an appeal procedure which is applicable whenever an application for a license or permit is denied, regardless of whether it is an original application or an application for renewal. The appeal procedure is found at §§ 11-438 (b) and (c) which provide:

> (b) Whenever an application is denied, the City Treasurer shall notify the applicant in writing of the reasons for such action; such notice shall also advise the applicant of the applicant's right to request a hearing before the City Council. If the applicant desires to request a hearing before the City Council to contest the denial of an application, such request shall be made in writing to the Clerk of the City Council within ten (10) days of the applicant's receipt of the notification of the denial of the application. If the applicant timely requests such a hearing, a public hearing shall be held within fifteen (15) days of the Clerk's receipt of such request before the City Council at which time the applicant may present evidence as to why the application should not be denied. The City Council shall hear evidence concerning the basis for denial of the application and shall affirm or reverse the denial of an application at the conclusion of said hearing; any such hearing shall be concluded no later than twenty-two (22) days after the applicant's receipt of notification of denial of an

application, unless an extension beyond such time period is requested by the applicant and granted by the City Council.

     (c)     If the City Council affirms the denial of an application, the Office of the City Attorney shall institute suit for declaratory judgment in a court of record in Hamilton County, Tennessee, within five (5) days of the date of any such denial seeking an immediate judicial determination of whether such application has been properly denied under the law.

In addition to challenging the constitutionality of the above procedures, Defendants also claim the procedure for revoking licenses and permits contained in the City Code is unconstitutional. Section 11-432 sets forth various reasons for which a license or permit can be revoked and the procedure for revocation. As relevant to this appeal, this section provides:

     (a)     The mayor shall revoke a license or permit for any of the following reasons:

* * * *

     (2)     The operator, entertainer, or any employee of the operator, violates any provision of this article or any rule or regulation adopted by the city council pursuant to this article; …

* * * *

     (9)     Any operator allows continuing violations of the rules and regulations of the Chattanooga-Hamilton County Health Department.

     (10)     Any operator fails to maintain the licensed premises in a clean, sanitary and safe condition.

     (b)     Notwithstanding anything herein to the contrary, before revoking or suspending any license or permit, the Mayor shall give the license holder or permit holder not less than ten (10) nor more than twenty (20) days' written notice of the charges against such license holder or permit holder and of the revocation of such license or permit, or of the period of time such license or permit is to be suspended; such notice shall also advise the license holder or permit holder of the license holder's or permit holder's right to request a hearing before the City Council. In the event the license holder or

permit holder does not request in writing a hearing before the City Council within the time set forth in such notice, the suspension or revocation shall be effective beginning the date set forth in such notice.

If the license holder or permit holder desires to request a hearing before the City Council to contest the suspension or revocation, such request shall be made in writing to the Clerk of the City Council within ten (10) days of the license holder's or permit holder's receipt of the notification from the Mayor. If the license holder or permit holder requests such a hearing, the effective date of a suspension or hearing shall be stayed pending the final outcome of judicial proceedings to determine whether such license or permit has been properly revoked or suspended under the law.

If the license holder or permit holder timely requests such a hearing, a public hearing shall be held within fifteen (15) days of the Clerk's receipt of such request before the City Council at which time the license holder or permit holder may present evidence as to why the suspension or revocation is improper or contrary to the provisions of this Article. The City Council shall hear evidence concerning the basis for such suspension or revocation and shall affirm or reverse the suspension or revocation at the conclusion of said hearing; any such hearing shall be concluded no later than twenty-two (22) days after the license holder's or permit holder's receipt of notification of the suspension or revocation, unless an extension beyond such time period is requested by the license holder or permit holder and granted by the City Council.

(c)    If the City Council affirms the suspension or revocation, the Office of the City Attorney shall institute suit for declaratory judgment in a court of record in Hamilton County, Tennessee, within five (5) days of the date of any such affirmation seeking an immediate judicial determination of whether such license or permit has been properly revoked or suspended under the law.…

On September 19, 2002, Franklin filed an application to renew his license for another one-year period. Franklin never obtained a renewed license because on November 7, 2002, Chattanooga Mayor Bob Corker (the "Mayor") notified Franklin that even though the renewal application had been received, pursuant to the provisions of City Code § 11-432(a) his current adult oriented establishment license would be revoked permanently effective November 18, 2002, which was the date his then current license was to expire. The Mayor informed Franklin that a long-term undercover investigation by CPD showed "continued violations of the Ordinances of the City of

Chattanooga, violations of Health Department rules; and … [a] failure to maintain the premises in a clean, sanitary and safe condition." The Mayor also advised Franklin that he had ten days to request a hearing before the City Council to contest revocation of his license and, if such a request was made, the revocation would be stayed pending the final outcome.

After receiving notice that his license had been revoked, Franklin submitted a timely request for a hearing before the City Council. The hearing was conducted on November 25, 2002, at which time both Franklin and the City were represented by counsel. The first witness was the Mayor who testified that he revoked Franklin's license after reviewing CPD reports of the undercover operations which took place at Cinema 1. Among other things, these reports detailed the sexual activity happening at Cinema 1, some of which had been recorded on video tape.

The next witness after the Mayor was Gerald Dossett ("Dossett"), a CPD detective. Dossett testified he has been involved with the investigation of Cinema 1 for three years. The investigation began after CPD received "official complaints from the health department … [and] call-in complaints from private citizens." According to Dossett, he and other detectives would pose as business patrons and observe what was taking place at Cinema 1, then write a report detailing what they observed. These undercover visits took place on different days of the week and at varying times. The officers' reports were admitted into evidence and Dossett testified to the contents of his reports and to the various forms of sexual activity he witnessed while posing as a patron of Cinema 1. CPD officers made approximately fourteen undercover visits to Cinema 1 between July of 1999 and January of 2000. The investigation stopped during internal restructuring of CPD and was later resumed with four undercover visits during November and December of 2001, four more between January and June of 2002, one in August of 2002, and two in November of 2002.

Dossett also described the interior of Cinema 1. There is a area which he referred to as the "mini-movie section" which consists of approximately eighteen separate booths, each with its own television for viewing adult movies. Because the booths do not have any doors, any sexual activity taking place inside one of the booths is visible to patrons in the common area.[2] Dossett described another area referred to as the "theater" which has seating for approximately eighty patrons and which shows adult movies on a big screen. According to Dossett, it is in the mini-movie and theater sections where the sexual activity was taking place.

While we find it unnecessary to detail all of the sexual activity witnessed by the various officers during the numerous undercover visits to Cinema 1, some detail is necessary.

---

[2] The City Code requires the entire interior portion of such booths to be visible from the common area of the premises and precludes "secluded viewing" of adult oriented movies. § 11-434(g). This open booth requirement was specifically held to be constitutional by the United States District Court for the Eastern District of Tennessee in *Broadway Books Inc. v. Roberts*, 642 F. Supp. 486 (E.D. Tenn. 1986). The plaintiffs in *Broadway Books* were the owners of three adult bookstores in Chattanooga. The plaintiffs argued, among other things, that the open booth requirement violated their customers' right to privacy. The District Court disagreed after refusing to find "that the patrons have some kind of right to masturbate themselves and others in the seclusion of these booths. This is not a 'right' which is protected by the first amendment." *Id*. at 492.

Dossett's first undercover visit to Cinema 1 occurred on July 21, 1999. On that date Dossett observed eight males in booths by themselves with their genitals exposed and who were masturbating. One booth contained two men, both of whom were masturbating. Dossett noted in his report that one of the booths contained a dried fluid on the plexiglass that covered the television which, in his opinion, "looked like dried semen." Dossett's next visit occurred on July 27, 1999, at which time he observed, among other things: a) two men "playing with each other's penis"; b) one man performing fellatio on another man; and c) four men in separate cubicles masturbating. A second CPD report dated July 21, 1999, indicates that an employee of Cinema 1 began sweeping the mini-movie section with a broom and dust pan while several patrons were masturbating or engaging in oral sex. According to the report, the presence of the employee "had no effect on the conduct of the patrons." On July 28, 1999, the same officer witnessed several men masturbating in the cubicles and one man performing oral sex on another man. There were three people standing around in the mini-movie common area at that same time. The officer believed at least two of these three individuals were Cinema 1 employees because he had seen then working behind the counter on previous undercover visits. Other reports also described sexual activity being unaffected by the presence of Cinema 1 employees who were attempting to clean the mini-movie section.

While there were one or two visits where little or no sexual activity was observed, suffice it to say that on the vast majority of the undercover visits sexual activity was taking place. For example, on one occasion the undercover officer observed nine males masturbating. On another occasion, the officer observed six sets of males engaged in oral sex. Several of the reports describe as many as three or more men in one booth at the same time engaging in various sexual acts, and many of the officers observed patrons ejaculating on the floor and walls. During Dossett's testimony, a video tape was shown to the City Council. Dossett explained that he video taped one of his undercover visits to Cinema 1 and this tape showed several patrons engaging in sexual activity. The City also called officer Lee Wolff and Sergeant Kirk Eidson as witnesses. Both of these witnesses testified to what they observed during their undercover visits to Cinema 1, and their testimony was in large part similar to Dossett's.

Franklin also testified at the hearing. Franklin acknowledged that Cinema 1 had been padlocked for four weeks in 2002 after the City instituted litigation claiming Cinema 1 was a public nuisance. Cinema 1 reopened after Franklin agreed to take several steps to abate the public nuisance.[3] Among other things, he agreed to install video surveillance cameras in the mini-movie section so employees could monitor what was taking place and stop any sexual or other type of misconduct. Signs were posted informing patrons that sexual activity was prohibited. Franklin testified he has never condoned any sexual activity taking place at Cinema 1. Franklin

---

[3] On July 3, 2002, the Hamilton County Criminal Court specifically found the Cinema 1 business premises to be a potential health hazard because "unsafe health conditions were allowed to persist at said premises which constituted a public nuisance." The parties to that litigation agreed Cinema 1 could be reopened if certain corrective measures were taken. After Cinema 1 reopened, CPD resumed its undercover operations and officers witnessed a male patron fondling another patron's exposed penis and a patron in the theater with his penis exposed. On one of these visits, a male patron propositioned three detectives for oral sex. After this patron rubbed an officer's chest and groin area, he was arrested for sexual battery. There was one visit where no inappropriate activity was observed.

acknowledged that even with the cameras and warning signs installed, "activities" were still taking place in the mini-movie section. According to Franklin, "Nothing is a hundred percent."

When the hearing was concluded, the City Council unanimously upheld the Mayor's revocation of Franklin's license. Pursuant to City Code §11-432(c), the City filed a declaratory judgment action seeking a determination that the revocation of Franklin's license was proper. At issue before the Trial Court was whether Article XIV was facially constitutional and, if so, whether Franklin's license had been properly revoked. Defendants argued, among other things, that Article XIV was facially unconstitutional because it did not assure prompt judicial review when a license or permit was denied or revoked. The Trial Court concluded Article XIV met the federal constitutional requirements, noting that the "revocation provisions contained within the Chattanooga City Code § 11-432 are constitutional under the First Amendment to the United States Constitution based upon the Supreme Court decisions and Sixth Circuit Court of Appeals decisions reviewed by the Court." The Trial Court then concluded that there was sufficient evidence to support revocation of the license.

Defendants appeal raising five issues in their statement of the issues. Although not stated exactly as such, Defendants claim the licensing scheme in the City Code is facially unconstitutional because: it lacks sufficient guarantees that a license will be promptly issued; and it fails to assure prompt judicial review when a license is revoked or denied. Defendants also argue the licensing scheme is unconstitutional because it places unbridled discretion in the hands of CPD. Defendants further claim the Trial Court lacked jurisdiction because the claims raised in the City's complaint for a declaratory judgment have been rendered moot. The final issue is Defendants' claim that, assuming this Court does not find the City Code facially unconstitutional, there was insufficient evidence to support revocation of the license.

## Discussion

The factual findings of the Trial Court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

A "prior restraint" exists when the exercise of First Amendment rights depends upon prior approval of public officials. *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson County*, 274 F.3d 377, 400 (6th Cir. 2001), *cert. denied* 535 U.S. 1073 (2002). A seminal[4] case interpreting the First Amendment is *Freedman v. Maryland*, 380 U.S. 51 (1965), which involved the constitutionality of a Maryland motion picture censorship statute. In that case, the United States Supreme Court stated that "[a]ny system of prior restraints of expression comes to this

---

[4] No pun intended.

Court bearing a heavy presumption against its constitutional validity." *Id*. at 57 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)). The Court in *Freedman* declared the Maryland statute unconstitutional and required three procedural safeguards in order for a prior restraint scheme to avoid infirmity under the Constitution. These safeguards are:

> (1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court.

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 227 (1990)(citing *Freedman*, 380 U.S. at 58-60). At issue in *FW/PBS* was whether the three *Freedman* procedural requirements were applicable to a city ordinance regulating sexually oriented businesses. The Supreme Court's opinion in *FW/PBS* was fragmented, with three Justices concluding that only the first two requirements applied, three Justices concluding all three requirements applied, and three Justices concluding none of them applied. As a result, "[l]icensing schemes in a city ordinance regulating sexually oriented businesses constitute a prior restraint that must incorporate at least the first two *Freedman* procedural safeguards." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson County*, 274 F.3d 377, 400-01 (6th Cir. 2001).

Defendants' main argument in the present case is that the City Code is facially unconstitutional because it does not assure prompt judicial review when a license or permit is denied or revoked. In making this argument, Defendants primarily rely on decisions by the United States Court of Appeals for the Sixth Circuit beginning with *East Brooks Books, Inc. v. City of Memphis*, 48 F.3d 220 (6th Cir.), *cert. denied* 516 U.S. 909 (1995). In *East Brooks*, the plaintiff brought suit challenging the constitutionality of a Memphis zoning and licensing ordinance which regulated sexually oriented businesses. The ordinance imposed several requirements on the operators of such businesses and further required the issuance of a permit. The ordinance also required revocation or suspension of a permit if certain enumerated offenses were committed by the operator or on the business premises. *Id*. at 223. If the initial decision was adverse to the operator, an appeal to the Director of Police Services could be filed within ten days. The Director then was required to hold a hearing within sixty days and to issue a written decision within five days of the hearing. *Id* If the Director affirmed the suspension or revocation, the operator could appeal further by filing a common law writ of certiorari to a court of competent jurisdiction within thirty days. *Id*.

In determining whether the Memphis ordinance was facially constitutional, the *East Brooks* Court observed that one of the procedural safeguards established by *Freedman* was that "expeditious judicial review must be available." *East Brooks,* 48 F.3d at 224 (citing *Freedman*, 380 U.S. at 59). In concluding that the Memphis Ordinance did not provide for expeditious judicial review and was, therefore, facially unconstitutional, the Sixth Circuit stated:

The ordinance provides for the appeal of adverse decisions by common law writ of certiorari. *See* § 20-124(6). Although defendants correctly state that review of administrative decisions by writ of certiorari is expressly authorized by statute in Tennessee, there is no guarantee of prompt judicial review. Under Tennessee law, once a writ is issued, the Chief of Police would be directed to immediately provide a transcript. *See* Tenn. Code Ann. § 27-9-109. No time limit, however, is placed upon compliance. *Id.* Additionally, after the transcript is provided, the appeal will not be heard for at least ninety days. *See* Tenn. Code Ann. § 27-9-111. Although the appeal would have precedence over other litigation, there is no assurance that it would be scheduled immediately at the end of ninety days. The ordinance, therefore, is plagued by the same indefinite delays that rendered the ordinance in … [*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990) (plurality opinion)] unconstitutional. *See also Redner v. Dean*, 29 F.3d 1495, 1497-98 (11th Cir. 1994) (holding that similar ordinance failed to provide adequate safeguards where administrative hearing was scheduled "as soon as Board's calendar will allow.")

Moreover, even if the Chief of Police immediately supplies a transcript and a hearing is held at the end of ninety days, a permit applicant would still have to wait three to five months for judicial review. An applicant may wait sixty days before an initial hearing before the Director of Police Services and then – at minimum – ninety days before judicial review. Although the Supreme Court has not expressly defined prompt judicial review, we believe that potential delays of over five months are impermissible.… Accordingly, we hold that the licensing scheme fails to provide sufficient procedural safeguards and is unconstitutional.

*East Brooks*, 48 F.3d at 224-225.

Approximately three years after the Sixth Circuit in *East Brooks* found the Tennessee procedure for obtaining a writ of certiorari failed to "assure" prompt judicial review when First Amendment rights were implicated, the Tennessee legislature amended the relevant statutory provision effective April 23, 1998, by adding the following:

(e) If the final decision of a board or commission revokes, suspends, or denies a license or permit that is required prior to engaging in conduct protected by the First Amendment to the Constitution of the United States, and either the petitioner or the respondent requests an expedited hearing, the court shall hear the

matter and issue its decision within forty (40) days of the court granting the writ of certiorari. When an expedited hearing is requested, the board or commission shall forward the transcript described in § 27-9-109 within seven (7) days of the grant of the writ of certiorari.

Tenn. Code Ann. § 27-9-111(e)(pre-May 13, 2002, version).

The next decision relied upon by Defendants is *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884 (6th Cir. 2000), where the Sixth Circuit held a Paducah ordinance which regulated adult establishments was facially unconstitutional for several reasons, including its lack of the *Freedman* safeguard guaranteeing prompt judicial review. The ordinance at issue in *Nightclubs* provided that when a license was suspended or revoked, the licensee could seek review of the decision of the Board of Commissioners "in any court of competent jurisdiction." *Id.* at 891. In such a situation, the case would proceed according to standard Kentucky court rules with no time limit on furnishing a transcript, conducting a hearing, or rendering a judicial decision. According to the Sixth Circuit, the Kentucky procedure contained even greater potential for indefinite delays than the Memphis scheme found unconstitutional in *East Brooks*. *Id.* at 892. The Sixth Circuit also rejected the City of Paducah's argument that the requirement for prompt judicial review nevertheless was satisfied because a licensee could seek preliminary injunctive relief. According to the Court:

> This argument both misinterprets a long line of legal precedent in the area of prior restraints and minimizes the importance of the First Amendment freedoms at stake. As previously discussed, *Freedman*, *FW/PBS*, and *East Brooks Books* require an assurance of prompt judicial review; a theoretical possibility of expeditious judicial review is not constitutionally sufficient. A guarantee of prompt judicial review is necessary "because undue delay results in the unconstitutional suppression of protected speech." *FW/PBS*, 493 U.S. at 228, 110 S. Ct. at 596. If an applicant challenges the Board's decision to uphold the denial of a license, there is nothing in Kentucky law requiring the state court to swiftly schedule a hearing on a motion for injunctive relief. While we trust state courts to exercise due diligence, we cannot be sure that a state judge, who often is elected and toiling under a busy docket, will conduct a hearing and render a decision in a prompt manner.
>
> Moreover, this Circuit and a number of other circuits have held that a licensing scheme must reasonably ensure a prompt judicial determination, and not mere access to judicial review. *See Baby Tam & Co., Inc. v. City of Las Vegas*, 154 F.3d 1097, 1101 (9th Cir. 1998) ("'prompt judicial review' means the opportunity for a prompt hearing and a prompt decision by a judicial officer"); *11126 Baltimore Blvd.,*

-11-

> *Inc. v. Prince George's County, Maryland*, 58 F.3d 988, 1000-01 (4th
> Cir.) (en banc), *cert. denied*, 516 U.S. 1010, 116 S. Ct. 567, 133 L.
> Ed. 2d 492 (1995) (under *FW/PBS* and its progeny, prompt judicial
> determination is required); *East Brooks Books*, 48 F.3d at 225
> (prompt judicial adjudication required). Although the First, Fifth, and
> Eleventh Circuits have concluded that "for licensing ordinances,
> prompt judicial review only means access to prompt judicial review,"
> *Boss Capital, Inc. v. City of Casselberry*, 187 F.3d 1251, 1255 (11th
> Cir. 1999), this Court remains persuaded that Supreme Court
> precedent requires a sufficiently prompt determination on the merits.

*Nightclubs*, 202 F.3d at 892-93 (footnotes omitted).[5]

The most recent Sixth Circuit opinion relied upon by Defendants is *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson County*, 274 F.3d 377 (6th Cir. 2001), *cert. denied* 535 U.S. 1073 (2002). In *Deja Vu*, the Sixth Circuit had the opportunity to consider whether the 1998 amendment to Tenn. Code Ann. § 27-9-111 discussed above complied with the *Freedman* requirement for prompt judicial review. As relevant to this appeal, the plaintiffs in *Deja Vu* claimed the Nashville/Davidson County ordinance regulating sexually oriented businesses did not provide the necessary assurance of prompt judicial review. The ordinance provided that when an application for a license was denied, that decision may be appealed to the "circuit or chancery courts of Davidson County.… If the applicant chooses to appeal by filing a writ of certiorari, then the metropolitan government shall file the record of all proceedings with the court within ten days …." *Id*. at 401. The Sixth Circuit concluded that even with the 1998 amendment, the procedure for obtaining a writ of certiorari still failed to guarantee prompt judicial review in the event a license was denied. According to the Sixth Circuit:

> Tennessee state law requires that if an appeal is taken from an
> administrative decision barring an applicant from engaging in First
> Amendment activities, "the court shall hear the matter and issue its
> decision within forty (40) days of the court granting the writ of
> certiorari." T.C.A. § 27-9-111 (Michie 1999). The plaintiffs argue
> that these provisions fail to comply with the first two *Freedman*
> safeguards. We agree.

> "Whether the common law writ of certiorari will issue is a
> matter of discretion. It is not issued as a matter of right." *Boyce v.
> Williams*, 215 Tenn. 704, 389 S.W.2d 272, 277 (Tenn. 1965). Thus,

---

[5]The Sixth Circuit also pointed out that prompt judicial review required an expeditious decision as well as expeditious consideration of the dispute. "In baseball terms it would be like throwing a pitch and not getting a call. As legendary major league umpire Bill Klem once said to an inquisitive catcher: 'It ain't nothin' till I call it.' This is also true of judicial review. Until the judicial officer makes the call, it ain't nothin'…." *Nightclubs*, 202 F.3d at 893 (quoting *Baby Tam & Co., Inc. v. City of Las Vegas*, 154 F.3d 1097 at 1101-02 (9th Cir. 1998)).

the Ordinance, in requiring that aggrieved applicants proceed to court via a discretionary route, fails to guarantee a "final judicial adjudication on the merits," as required under *Freedman's* first safeguard. Metropolitan Nashville points to *State v. Johnson*, 569 S.W.2d 808 (Tenn. 1978), for support that Tennessee courts will not deny a writ in this context. *See id.* at 815 (finding that writs should issue where denial of the writ is "tantamount to the denial to either party of a day in court"). Even that case, however, reiterates the rule that "certiorari is a discretionary writ." *Id*. at 814 (noting that whether a lack of appellate remedy exists is "critical" for determining whether to grant a writ). Because Metropolitan Nashville has failed to demonstrate that the denial of a writ would be tantamount to the denial to an applicant of a day in court, we cannot agree that this discretionary writ guarantees an aggrieved applicant that a court will hear and decide the merits of her claim, as required by *Freedman*.

* * * *

Without some affirmative evidence showing that every writ of certiorari will be granted, we find that the Ordinance's judicial review provisions do not guarantee prompt judicial review, as required by the First Amendment. The lack of a judicial review provision renders the entire statute facially unconstitutional, and therefore, severing the ineffectual provision will not save the statute. Under these circumstances, we cannot give effect to the severability clause, but must enjoin enforcement of the entire Ordinance.

*Deja Vu*, 274 F.3d at 401, 402-03 (footnotes omitted).

In short, even though the amended Tennessee statute established deadlines for judicial review of these matters, the *Deja Vu* Court concluded the procedure still was constitutionally defective under the First Amendment because the decision of whether or not to grant the writ in the first place was left to the discretion of the trial court judge. Because there was no assurance that the writ would be granted, even with the 1998 amendment to Tenn. Code Ann. § 27-9-111, this procedure continued to fall short of guaranteeing prompt judicial review.

Effective May 13, 2002, and in direct response to the *Deja Vu* opinion, the Tennessee legislature again amended the procedure for obtaining a writ of certiorari when First Amendment rights were at issue. Tenn. Code Ann. § 27-9-111(e) now provides:

If the final decision of a board or commission revokes, suspends, or denies a license or permit that is required prior to engaging in conduct protected by the First Amendment to the

Constitution of the United States, and either the petitioner or respondent requests an expedited hearing, the court shall immediately grant the writ of certiorari, and shall hear the matter and issue its decision within forty (40) days of the court granting the writ of certiorari. When an expedited hearing is requested, the board or commission shall forward the transcript described in § 27-9-109 within seven (7) days of the grant of the writ of certiorari.

Tenn. Code Ann. § 27-9-111(e)(Supp. 2003).[6] This new version of the statute effectively removed a trial court's discretion on whether to grant the writ when either the petitioner or respondent requests an expedited hearing and the petition involves the decision of a board or commission revoking, suspending, or denying a license or permit that is required prior to engaging in conduct protected by the First Amendment.

Against this backdrop, we now turn to the issue of whether Article XIV of the Chattanooga City Code is facially unconstitutional because it does not assure prompt judicial review when a license or permit is denied or revoked. This Court is bound to apply First Amendment procedural safeguards as established by the United States Supreme Court. However, as noted by the Sixth Circuit in *Nightclubs,* there is sharp disagreement among the United States Courts of Appeals regarding whether *Freedman* requires only access to prompt judicial review, or whether it requires an assurance of prompt judicial review. *See Nightclubs*, 202 F.3d at 892. The United States Supreme Court apparently intended on resolving this disagreement when it granted certiorari in *Thomas v. Chicago Park District*, 534 U.S. 316 (2002), but when that opinion was decided the Supreme Court expressly declined to resolve the disagreement because it concluded the ordinance under review in that case was not subject to any of the *Freedman* requirements. *Id.* at 325.

In the present case, the City Code requires the City to file a declaratory judgment action within five days of the City Council affirming the denial or revocation of a license or permit. Defendants argue that because a trial court has discretion on whether to entertain a declaratory judgment action, the City Code must be declared facially unconstitutional as was the case in *Deja Vu* when the Sixth Circuit held Tenn. Code Ann. § 27-9-111(e) did not "assure" prompt judicial review because a trial court had discretion on whether or not to grant a writ of certiorari. Defendants are correct that under Tennessee law a trial court has wide discretion in deciding whether to entertain a declaratory judgment action. *See, e.g., State ex rel. Earhart v. Bristol*, 970 S.W.2d 948, 954 (Tenn. 1998)("The trial court's discretion is refusing a declaration is 'very wide,'… and will not be disturbed on appeal unless the trial judge has acted arbitrarily.")(citations omitted). Because of this discretion, we must conclude that the availability of a declaratory judgment action, while certainly

---

[6] The Tennessee legislature provided that the 2002 amendment would not take effect until such time as the United States Supreme Court denied certiorari in *Deja Vu* or, if certiorari was granted, until such time as the Supreme Court affirmed the decision of the Sixth Circuit. If certiorari was granted and the decision of the Sixth Circuit was reversed on the issue of prompt judicial review, then the amendment "shall never take effect." *See* 2002 Tenn. Pub. Acts, Chapter 615, § 2. The Supreme Court denied certiorari in *Deja Vu* on May 13, 2002. *See Metro. Gov't of Nashville and Davidson County v. Deja Vu of Nashville, Inc.*, 535 U.S. 1073 (2002).

-14-

constituting access to judicial review, cannot be said to constitute an assurance of prompt judicial review.

This conclusion, however, does not end our inquiry because a declaratory judgment action is not the only available avenue of judicial review. To so hold would require this Court to completely ignore the existence of Tenn. Code Ann. § 27-9-111(e) and the Tennessee Legislature's many efforts to bring that statutory procedure in line with the evolving decisions of the Sixth Circuit. Tenn. Code Ann. § 27-9-111(e) does exist, and our review of the constitutionality of the Chattanooga City Code must take it into consideration. With the most recent amendment to Tenn. Code Ann. § 27-9-111(e), whenever any board or commission in Tennessee "revokes, suspends, or denies" a license which is required prior to engaging in conduct protected by the First Amendment, the applicant or license holder can immediately file a petition for writ of certiorari and request an expedited hearing. The trial court then must grant the writ and issue a decision within 40 days. The foregoing procedure was available to Defendants in the present case, and to any such similar defendants, after the City Council affirmed the Mayor's revocation of the license. This procedure was available to Defendants as a matter of state law and the Chattanooga City Code did not, and could not, lessen in any way its availability to Defendants.

We conclude that with the 2002 amendment to Tenn. Code Ann. § 27-9-111(e), Defendants, and anyone else similarly situated, are "assured" prompt judicial review when a license which is required prior to engaging in First Amendment conduct is revoked, suspended, or denied. The amended statute, therefore, meets the standard required by the Sixth Circuit and the other federal Courts of Appeals which require an assurance of prompt judicial review. It also meets the lesser standard required by several other Courts of Appeals which hold that only access to prompt judicial review need be available. Because both standards are met in this case, we need not formally decide which of the two federal standards we believe to be the proper interpretation of *Freedman.*

As discussed previously, the third procedural safeguard established in *Freedman* required the censor to bear the burden of going to court to suppress the speech and to bear the burden of proof. 380 U.S. at 58-60. Six of the Supreme Court Justices in *FW/PBS, supra,* concluded this third requirement did not apply to city ordinances regulating sexually oriented businesses. As such, in the present case the City was under no federal constitutional requirement to file a lawsuit to establish the propriety of the City Council's decision to revoke Franklin's license. Because Tenn. Code Ann. § 27-9-111(e), as amended, provides Defendants an assurance of prompt judicial review, the portion of the City Code requiring the City to initiate a lawsuit by seeking a declaratory judgment is not required under federal law. We do not believe the City Code is rendered facially unconstitutional simply because the City provides *another* avenue for judicial review by way of declaratory judgment, even if this additional avenue cannot be said to "assure" prompt judicial review and is not constitutionally required. We reject Defendants' argument that the licensing scheme contained within Article XIV of the City Code is facially unconstitutional because it fails

-15-

to assure prompt judicial review in the event a license is denied or revoked, and we affirm the Trial Court's judgment on this issue.[7]

The next constitutional challenge by Defendants is their claim that the City Code is facially unconstitutional because the licensing scheme lacks a guarantee that a license will be promptly issued. The City Code's procedures require CPD to investigate the applicant's qualifications and to provide its results to the city treasurer within twenty days of the application being filed. Within ten days of receiving the results, the city treasurer "shall notify" the applicant that the application is granted, denied, or held for additional investigation which cannot exceed thirty more days. After the additional investigation is concluded, the applicant then must be told if the application is granted or denied. Defendants challenge this scheme because the City Code "is silent as to what occurs should the city treasurer fail to act within the 10 day period …."

In our opinion, the fatal flaw with this argument is that Defendants are assuming that the city treasurer at some point in time will not fulfill the mandatory requirements of his or her job. The City Code is quite clear regarding the time frame in which the city treasurer must notify an applicant of the results of the application. Even if the city treasurer does not provide the necessary response in ten days, this does not necessarily mean a constitutional violation will occur. If the licensing scheme as a whole is considered to provide a prompt response to the license request when the city treasurer responds within the required ten day period, it is unlikely that the constitutional soundness of this scheme will fall apart if the city treasurer responds in twelve or fourteen days. Of course, if the city treasurer does fail to respond such that constitutional implications arise, then the applicant in that situation can avail himself of remedies available under the law. In order to be facially constitutional, the City Code must establish a prompt time frame for an applicant to be issued a license. The City Code does just that. We do not believe the City Code is rendered facially unconstitutional simply because it does not provide for an eventuality which will never happen unless the mandatory provisions of the City Code are violated by the city treasurer.

The final constitutional challenge is Defendant's claim that the City Code is unconstitutional because it vests unbridled discretion in the hands of CPD. We disagree. The City Code requires an applicant to provide certain information when an application is filed. § 11-424. The City Code also sets forth certain standards for issuance of a license. § 11-425. The CPD then is required to investigate the applicant's qualifications. As we interpret the City Code, the reasons for which an application can be denied are set forth in these sections. When determining if an applicant is qualified to be issued a license, CPD necessarily is limited to ascertaining if the applicant

---

[7] Defendants also argue that a declaratory judgment is not the proper manner in which to seek judicial review of the decision of a board or commission. A declaratory judgment would be proper if one is seeking to invalidate an ordinance. The remedy of certiorari is the proper remedy when seeking to overturn a decision of a board or commission. We agree with Defendants that judicial review of the City Council's administrative decision to revoke the license should be had via writ of certiorari. However, we also point out that in *Fallin v. Knox County Board of Commissioners*, 656 S.W.2d 338 (Tenn. 1983), the Tennessee Supreme Court expressly allowed an application for certiorari to be treated as a declaratory judgment action. In *McCallen v. Memphis*, 786 S.W.2d 633 (Tenn. 1990) the Supreme Court stated this rationale "applies equally well in the reverse." *Id*. at 640.

meets the particular qualifications specifically set forth in the ordinance. If a license were to be denied for an allegedly improper reason, then the applicant has the assurance of prompt judicial review of that claimed improper decision. CPD, therefore, does not have "unbridled discretion" in determining if an applicant meets the ordinance's qualifications.

Next, Defendants argue that this entire litigation is moot. As discussed earlier in this Opinion, Franklin submitted an application to renew his license sixty days before it was set to expire. Shortly thereafter, Franklin was notified by the Mayor that his current license was being revoked. The revocation proceedings quite obviously still are proceeding. Franklin never heard anything with regard to his renewal application. Defendants' argument that this case is moot goes something like this: (1) the City is constitutionally required to act promptly when deciding whether to renew Franklin's license; (2) the City has never made any determination on whether to renew the license; (3) the City's altogether unconstitutional failure to act on the renewal application must be construed as an admission that the license was renewed; and (4) because Franklin must be considered as having a brand new license, revocation of his previous license is pointless, thereby rendering the present litigation moot.

While we agree that the First Amendment prohibits the City from never responding to an application for renewal of this particular type of license, Defendants' argument overlooks the fact that when Franklin's license expired on November 18, 2002, *that* license was revoked. The revocation then triggered the appeal procedure contained within the ordinance and effectively prohibited issuance of a new license pending the final outcome of the appeal process. As constitutionally required, the status quo has been continuously maintained with revocation of the license being stayed pending the final outcome of the appeal. We do not believe the federal Constitution requires the City to issue, by renewal, a new license to Franklin while the parties are actively litigating whether the previous license properly was revoked. This argument is without merit.

Franklin's final argument is that there was insufficient evidence to support revocation of his license. Defendants argue that many of the undercover operations took place outside the time frame for which the current license was valid. Defendants maintain that the current license can only be revoked for events which happened while that particular license was active.

To be sure, the sexual activity and related events which resulted in revocation of Franklin's license are the very type of activities which Article XIV of the City Code is aimed at preventing. CPD conducted an investigation over the course of approximately three years. The evidence presented both at the hearing and before the Trial Court showed that rampant sexual activity was occurring at Cinema 1 over this extended period of time. The sexual activity was so extreme that, while the license at issue was active, the Hamilton County Criminal Court declared Cinema 1 to be a public nuisance and Franklin thereafter agreed to take remedial steps to abate this public nuisance. Franklin admitted that even after these remedial steps were taken, these "activities" continued. The fact that the sexual activity had not stopped was verified by the undercover operations which took place after the padlocks on Cinema 1 were removed. It is important to note

that some of the sexual activity took place right in front of Cinema 1 employees who did nothing to stop the misconduct. Quite simply, Franklin's argument that there was insufficient evidence that he had knowledge that these activities were taking place simply defies logic. Even if we were to conclude that some of the earlier undercover visits were too distant to be properly considered herein, we nevertheless would conclude there was overwhelming evidence presented to support revocation of the license.

### Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. Costs on appeal are assessed against the Appellants David Franklin and Cinema 1, and their surety.

_____
D. MICHAEL SWINEY, JUDGE