EAST BROOKS BOOKS, INC. (93–6102); Steven C. Cooper; and Southern Entertainment Management Company, Inc. (93–6103), Plaintiffs–Appellants/Cross–Appellees,

v.

CITY OF MEMPHIS, Defendant–Appellee/Cross–Appellant (93–6104),

W.W. Herenton and Melvin Burgess, Defendants–Appellees.

Nos. 93–6102, 93–6103 and 93–6104.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 19, 1995.

Decided March 7, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied May 5, 1995.

Frierson M. Graves (argued and briefed), Michael F. Pleasants, Heiskell, Donelson, Bearman, Adams, Williams & Caldwell, Memphis, TN, for East Brooks Books, Inc.

Robert B. Rolwing, Memphis, TN (argued and briefed), for City of Memphis, defendant-appellee W.W. Herenton and Melvin Burgess in Nos. 93–6102, 93–6104.

Rex L. Brasher, Jr. (briefed), Brown, Brasher & Smith, Memphis, TN, for Steve C. Cooper, Southern Entertainment Management Co., Inc. dba Club Tiffany plaintiff-appellant.

Monice M. Hagler, Robert B. Rolwing (argued and briefed), Memphis, TN, for City of Memphis, W.W. Herenton and Melvin Burgess in No. 93–6103.

Before: KENNEDY and SUHRHEINRICH, Circuit Judges; and HOOD, District Judge.*

KENNEDY, Circuit Judge.

Plaintiffs, East Brooks Books, Inc., Steve C. Cooper, and Southern Entertainment Management Company, Inc., brought this action against the City of Memphis, Mayor W.W. Herenton and Police Director Melvin Burgess challenging the constitutionality of a licensing and zoning ordinance for sexually oriented businesses.[1] The District Court granted partial summary judgment to defendants on the licensing provisions and granted partial summary judgment to plaintiffs on the zoning provisions. Both parties appeal. Plaintiffs argue that the licensing scheme constitutes an impermissible prior restraint on protected speech. On cross-appeal, defendants argue that the District Court erroneously held that the amortization provision of the zoning regulations violated Tennessee law. For the following reasons, we affirm in part, reverse in part, and vacate in part.

## I. The Licensing Scheme

On January 15, 1991, the Memphis City Council passed Ordinance 4013 ("the ordinance") which imposed a licensing and zoning scheme on all sexually oriented businesses within the City of Memphis ("the city").[2] The ordinance was enacted "to regulate sexually oriented business to promote the health, safety, morals, and general welfare of the citizens of the city and to establish reasonable and uniform regulations to prevent the continued concentrations of sexually oriented businesses within the city." See § 20–121(a). The Preamble to the ordinance states that the Memphis City Council concluded that there were serious secondary effects, such as crime and neighborhood deterioration, associated with the proliferation of sexually oriented businesses within the city. The City Council reached these conclusions after reviewing reports of the unusually large number of criminal arrests around sexually oriented businesses, reports prepared by the Memphis Vice Squad, and studies of the impact of sexually oriented businesses on other cities.

---

* The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

1. Plaintiff East Brooks Books, Inc. is a corporation that owns and operates two adult bookstores in the city. Plaintiff Southern Entertainment Management Company, Inc. is a corporation owned by Steve C. Cooper that operates an adult night club in Memphis featuring exotic dancing.

2. The ordinance defines a sexually oriented business as "an adult arcade, adult bookstore or adult video store, adult cabaret, adult motel, adult motion picture theater, adult theater, escort agency, nude model studio, or sexual encounter center or [for certain purposes] adult telecommunications business." See § 20–121(b)(22).

The ordinance imposes the following requirements on operators of sexually oriented businesses.[3] Anyone wishing to operate a sexually oriented business must apply for an operator's permit by filling out a form provided by the city's Director of Police Services. *See* § 20–122(a)(3). The Director of Police Services must issue a permit within 30 days unless the applicant possesses an enumerated "disabling factor," such as being overdue in payment of taxes or fines related to the business, failure to provide necessary information or providing false information on the application, or conviction of certain crimes within a specified time period. *See* § 20–122(b)(1) and (b)(3). Additionally, an applicant may not be issued a permit if he or she "has demonstrated an inability to operate or manage a sexually oriented business premises in a peaceful and law-abiding manner, thus necessitating action by law enforcement officers." *Id.*

Sexually oriented businesses also must obtain permits for any employees and independent contractors whom they hire. *See* § 20–122(a)(8). Employees and independent contractors are subject to the same disabling factors for prior criminal convictions as operators. *Id.* All sexually oriented businesses are subject to a $5000 operating fee; employees and independent contractors are subject to a $15 fee. *See* § 20–122(c).

The ordinance limits the issuance of operating permits to natural persons. *See* § 20–122(a)(7). If a sexually oriented business is operated by an entity rather than an individual, each person who owns any interest in the entity must sign the application form and meet the qualification requirements discussed above. *See* § 20–122(a)(5). Sexually oriented businesses are subject to inspection by a variety of city departments, including the police and health departments, at any time the premises are occupied or open for business. *See* § 20–122(d).

The ordinance also contains provisions for the revocation and suspension of permits. The Director of Police Services is required to revoke or suspend an operator's permit if

certain enumerated offenses are committed either by the operator or on the premises. *See* § 20–123. A permit will generally be revoked for five years, but in certain enumerated circumstances an operator may be able to apply for a new permit in ninety days. *See* § 20–123(b)(5). Suspensions may be for thirty days or less. *See* § 20–123(a).

The ordinance provides for appeals from the denial, revocation, or suspension of a permit. *See* § 20–124. After an adverse decision, an applicant has ten days to file an appeal with the Director of Police Services, who must hold a hearing within sixty days. *See* § 20–124(2) and (3). The Director of Police Services must make a decision in writing within five days of the hearing. *See* § 20–124(5). If an operator appeals the suspension or revocation of a permit, the suspension or revocation will not occur within sixty days of the notice of appeal or prior to the date of the hearing, whichever is less, unless a health officer determines that there is a health hazard. *See* § 20–124(4). An applicant or permittee whose permit is denied, suspended, or revoked may appeal the Director's decision by common law writ of certiorari to a court of competent jurisdiction within thirty days. *See* § 20–124(6). No permit may be extended during a court appeal unless the court orders a writ of supersedeas. *See* § 20–124(7).

The District Court held that plaintiffs lacked standing to challenge the use of prior convictions to deny a permit and the disabling provisions for permit suspension and revocation. The District Court upheld the constitutionality of all of the other licensing provisions, except the $5,000 permit fee. Subsequently, the city reduced the licensing fee from $5000 to $500. Plaintiffs do not challenge the reduced fee. Additionally, the ordinance was modified to allow any adult oriented business operating at the time the ordinance becomes effective to continue to operate pending its permit application, provided the application is submitted within thirty days of the ordinance's effective date.

---

**3.** In addition to the provisions discussed here, the ordinance also contains additional regulations for escort agencies, nude modeling studios, adult theaters, adult motion picture theaters, and adult hotels. *See* § 20–128—§ 20–131. These regulations are not at issue in this case.

## A. *The Adequacy of Procedural Safeguards*

■ Plaintiffs make a facial challenge to the licensing scheme. "[O]ur cases have long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 755–56, 108 S.Ct. 2138, 2143, 100 L.Ed.2d 771 (1988). Failure to place time limitations on a decision maker is a form of unbridled discretion. *See Freedman v. Maryland,* 380 U.S. 51, 56–57, 85 S.Ct. 734, 737–38, 13 L.Ed.2d 649 (1965). Thus, in *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 224, 110 S.Ct. 596, 603, 107 L.Ed.2d 603 (1990) (plurality op.), the Supreme Court held that when a licensing scheme creates a risk of delay, a facial challenge is appropriate because " 'every application of the statute create[s] an impermissible risk of suppression of ideas.' " (*quoting City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 798, n. 15, 104 S.Ct. 2118, 2125, n. 15, 80 L.Ed.2d 772 (1984)).

In *Freedman,* the Supreme Court struck down a Maryland motion picture censorship statute, holding that the statute failed to provide sufficient procedural safeguards to protect First Amendment rights. *See* 380 U.S. at 51, 85 S.Ct. at 735. The Court determined that the following three procedural safeguards were required. First, any restraint imposed in advance of a final judicial determination must be for only a brief period of time and must be limited to preserving the status quo. *Id.* at 59, 85 S.Ct. at 739. Second, expeditious judicial review must be available. *Id.* Third, the censor must bear both the burden of seeking judicial review and the burden of proof. *Id.* at 59–60, 85 S.Ct. at 739–40.

In *City of Dallas,* the Supreme Court held that a licensing scheme did not present the grave dangers of a censorship scheme; therefore, the full procedural protections outlined in *Freedman* were unnecessary.[4] 493 U.S. at 228, 110 S.Ct. at 606. The Court noted that the licensing scheme for sexually oriented businesses in question did not require the city to evaluate the content of protected speech. *Id.* at 229, 110 S.Ct. at 606. Instead, the ordinance required the city to review the qualifications of the license applicants. *Id.* The Court reasoned, therefore, that the requirement in *Freedman* that the censor go to court to effect the denial of the license and bear the burden of proof was unnecessary. *Id.* at 230, 110 S.Ct. at 607.

> The core policy underlying *Freedman* is that the license for a First Amendment-protected business must be issued within a reasonable period of time, because undue delay results in the unconstitutional suppression of protected speech. Thus, the first two safeguards are essential: the licensor must make the decision whether to issue the license within a specified and reasonable time period during which the status quo is maintained, and there must be the possibility of prompt judicial review in the event that the license is erroneously denied.

*Id.* at 228, 110 S.Ct. at 606. Applying this standard, the Court held that the Dallas ordinance was invalid. *Id.* at 229, 110 S.Ct. at 606. Although the ordinance required the Chief of Police to approve a license application within thirty days, the ordinance also required a series of inspections before the license could be issued. *Id.* at 227, 110 S.Ct. at 605. The ordinance failed to ensure that an applicant would be able to arrange the needed inspections within the thirty-day period. *Id.* "Thus, the city's regulatory scheme allow[ed] indefinite postponement of the issuance of a license." *Id.* Additionally, the Dallas ordinance failed to provide for prompt judicial review if a license was denied. *Id.* at 229, 110 S.Ct. at 606.

■ Plaintiffs argue that the Memphis ordinance, like the Dallas ordinance, does not meet the standards articulated in *City of Dallas* because it does not ensure prompt judicial review. We agree. The ordinance

---

**4.** Although the Court's opinion was fragmented, six justices agreed that at least the first two requirements in *Freedman* were applicable.

provides for the appeal of adverse decisions by common law writ of certiorari. *See* § 20–124(6). Although defendants correctly state that review of administrative decisions by writ of certiorari is expressly authorized by statute in Tennessee, there is no guarantee of prompt judicial review. Under Tennessee law, once a writ is issued, the Chief of Police would be directed to immediately provide a transcript. *See* Tenn.Code Ann. § 27–9–109. No time limit, however, is placed upon compliance. *Id.* Additionally, after the transcript is provided, the appeal will not be heard for at least ninety days. *See* Tenn.Code Ann. § 27–9–111. Although the appeal would have precedence over other litigation, there is no assurance that it would be scheduled immediately at the end of ninety days. The ordinance, therefore, is plagued by the same indefinite delays that rendered the ordinance in *City of Dallas* unconstitutional. *See also Redner v. Dean*, 29 F.3d 1495, 1497–98 (11th Cir.1994) (holding that similar ordinance failed to provide adequate safeguards where administrative hearing was scheduled "as soon as Board's calendar will allow.")

■ Moreover, even if the Chief of Police immediately supplies a transcript and a hearing is held at the end of ninety days, a permit applicant would still have to wait three to five months for judicial review. An applicant may wait sixty days before an initial hearing before the Director of Police Services and then—at minimum—ninety days before judicial review. Although the Supreme Court has not expressly defined prompt judicial review, we believe that potential delays of over five months are impermissible. In *Southeastern Promotions, Ltd., v. Conrad,* 420 U.S. 546, 562, 95 S.Ct. 1239, 1248, 43 L.Ed.2d 448 (1975), for example, the Court held that a delay of more than five months was excessive. In *United States v. Thirty–Seven Photographs,* 402 U.S. 363, 373–74, 91 S.Ct. 1400, 1406–07, 28 L.Ed.2d 822 (1971), the Court construed 19 U.S.C. § 1305(a) to require that forfeiture proceedings for obscene materials be initiated within fourteen days and concluded within an additional sixty days. Accordingly, we hold that the licensing scheme fails to provide sufficient procedural safeguards and is unconstitutional.

Plaintiffs also argue that the licensing scheme violates the requirement in *City of Dallas* that the status quo be maintained pending judicial review. Specifically, plaintiffs contend that an applicant denied a permit must be allowed to operate pending judicial review. The status quo for a business seeking a permit to begin operating a sexually oriented business, however, is non-operation. The city, therefore, does not need to allow operation pending review. Additionally, the ordinance has been amended to allow sexually oriented businesses in operation at the time the ordinance becomes effective to continue operating while their applications are pending. At least in the case of a permit denial, *City of Dallas* does not require more. *See* 493 U.S. at 228, 110 S.Ct. at 606 ("[T]he licensor must make the decision whether to issue the license within a specified and reasonable time period during which the status quo is maintained, and there must be the possibility of prompt judicial review in the event that the license is erroneously denied."); *TK's Video, Inc. v. Denton County, Tex.,* 24 F.3d 705, 708–09 (5th Cir.1994) (holding that only businesses in operation at time the ordinance was enacted must be allowed to operate during the application process).

### B. *Content–Neutral Time, Place and Manner Analysis*

Plaintiffs next argue that the ordinance is not content neutral because it targets sexually oriented businesses. In *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 46–47, 106 S.Ct. 925, 928–29, 89 L.Ed.2d 29 (1986), the Supreme Court held that regulations aimed at the secondary effects of adult theaters, rather than the content of films shown, were properly analyzed as content-neutral time, place, and manner restrictions. The Court held that such regulations were not content-based merely because they distinguished between adult theaters and other kinds of theaters. *Id.* at 47, 106 S.Ct. at 928. *See also Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (upholding Detroit zoning ordinance aimed at secondary effects of adult theaters).

■ Like the zoning ordinance in *Renton,* the Memphis ordinance is aimed at the secondary effects of adult oriented businesses. The Preamble to the ordinance states that the Memphis City Council concluded that there were serious secondary effects, such as crime and neighborhood deterioration, associated with the proliferation of sexually oriented businesses within the city. The ordinance does not attempt to ban such businesses, nor does it pass judgment on the content of the products sold or entertainment provided by sexually oriented businesses.

■ The ordinance, therefore, is properly analyzed as a content-neutral regulation under the standards set forth in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).[5] To withstand constitutional scrutiny, the regulation must (1) be within the constitutional powers of government; (2) further a substantial government interest; (3) the government interest must be unrelated to the suppression of free expression; and (4) the regulation must pose an incidental burden on First Amendment freedoms that is no greater than is essential to further the government interest. *Id.* at 377, 88 S.Ct. at 1679. There is no doubt that the ordinance meets the first three requirements. Communities have a legitimate and substantial interest in controlling the secondary effects associated with sexually oriented businesses, and such regulation is within the constitutional powers of government. *See Renton,* 475 U.S. at 50, 106 S.Ct. at 930; *American Mini Theatres,* 427 U.S. at 71, 96 S.Ct. at 2452. Additionally, as discussed above, the ordinance is not aimed at the suppression of First Amendment rights. *See Renton,* 475 U.S. at 47, 106 S.Ct. at 928. We now turn to the provisions challenged by plaintiffs to determine whether each provision furthers the government interest in minimizing secondary effects without posing more than an incidental burden on First Amendment rights.

### 1. Shareholder Disclosure Requirements

The ordinance requires that if a business entity rather than an individual operates a sexually oriented business, each person with an ownership interest must sign the application and meet all qualification requirements. *See* § 20–122(a)(5). Plaintiffs argue that this requirement serves no legitimate purpose because shareholders normally have no responsibility for the everyday operation of a business. The District Court upheld this requirement, reasoning that it was narrowly tailored to further the city's legitimate interest in combatting crime. The District Court noted that the city had found that sexually oriented businesses were often operated by dummy corporations and individuals using aliases.

■ We agree that the City has a legitimate interest in identifying those who are legally accountable for the operation of a sexually oriented business, and perhaps those who have a controlling or significant share in such a business. The requirement that every person with any ownership interest, regardless of how small, sign the application, however, is impermissibly broad. *See Acorn Invest., Inc. v. City of Seattle,* 887 F.2d 219, 226 (9th Cir.1989) (invalidating similar disclosure provision). Additionally, such disclosure may chill protected expression. *See TK's Video,* 24 F.3d at 709. Accordingly, we hold that this provision is invalid.

### 2. The Requirement to Operate in a Peaceful and Law-Abiding Manner

■ The ordinance provides that the Chief of Police Services may deny the issuance of a permit, or may suspend an existing permit, if an applicant or permittee "has

---

5. The Supreme Court has used two tests to analyze content-neutral regulations. In *City of Renton,* the Supreme Court, citing *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984), examined whether the zoning restriction served a substantial government interest, allowed for reasonable alternative means of communication, and was narrowly tailored. *See* 475 U.S. at 50–52, 106 S.Ct. at 930–31. In *Clark,* the Supreme Court applied both the above test and the *O'Brien* test and noted that there was "little, if any" difference between the two. *Id.* 468 U.S. at 298, 104 S.Ct. at 3071. *See also City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 804–05, 104 S.Ct. 2118, 2128–29, 80 L.Ed.2d 772 (1984) (analyzing a municipal regulation of signs on public property under *O'Brien* ).

demonstrated an inability to operate or manage a sexually oriented business premises in a peaceful and law-abiding manner, thus necessitating action by law enforcement officers." *See* § 20–122(b)(1)(f) and 123(a)(5). Plaintiffs argue that this provision is impermissibly vague and broad. We agree. Although, as discussed below, plaintiffs lack standing to challenge most of the revocation and suspension provisions, the overbreadth doctrine permits plaintiffs to challenge this aspect of the suspension regulations. *See City of Lakewood*, 486 U.S. at 755–56, 108 S.Ct. at 2142–43.

This provision provides no criteria to determine what kind of conduct will result in a permit denial or suspension. Is a sexually oriented business subject to permit suspension if the police are called to the premises once, or several times a week? Does a business manager risk suspension by calling the police to report patrons who are engaging in illegal behavior? Presumably, the city desires the cooperation of the permittees to combat criminal activity at and around sexually oriented businesses. Additionally, there could be many conditions at a business "necessitating action by law enforcement officers" that are unrelated to a manager's ability to lawfully operate the business.

The District Court reasoned that although the terms of this provision were not precise, the ordinance as a whole made clear that "demonstrated inability" meant that actual violations of the law had occurred on the business premises. Other provisions of the ordinance, however, already allow for denial, suspension or revocation of a permit for enumerated violations of the law. We, therefore, conclude that this provision is impermissibly vague and vests unbridled discretion in the hands of the Chief of Police Services.

### 3. *Other Disabling Provisions*

In addition to the inability to operate the business in a peaceful manner, the ordinance lists other "disabling factors" that either bar issuance of a permit, or are cause for permit suspension or revocation.[6] Suspensions last up to thirty days; revocations last up to five years. *See* § 20–123(a), 123(b)(5). Plaintiffs challenge both the specific disabling factors, as well as the length of the suspensions and revocations.

▓▓▓ The District Court held that plaintiffs lacked standing to challenge any of the disabling factors for suspension and revocation, and lacked standing to challenge prior convictions as a grounds for denial of a permit. The District Court, however, upheld the disabling factors other than criminal convictions for permit issuance. Defendants argue that plaintiffs lack standing to challenge any of the disabling provisions for permit issuance, suspension, or revocation. We agree. Plaintiffs have not alleged that any of the disabling factors that would bar the issuance of a permit apply to them. *See City of Dallas*, 493 U.S. at 230–36, 110 S.Ct. at 607–10 (holding that plaintiffs have no standing to challenge disability provisions where record contained no allegations that they were subject to provisions). Although one of the plaintiffs alleges he was convicted of a disabling crime in the past, he concedes that the conviction would not bar a permit because the period of disability has passed. *Id.* Nor have plaintiffs demonstrated that they have standing to challenge the disabling factors for suspension or revocation. *Id.* at 235, 110 S.Ct. at 609.

Accordingly, we hold that with the exception of the provision discussed above in part

---

**6.** Disabling factors for issuance of a permit include being underage, overdue in payment of taxes or fines related to the business, failure to provide necessary information or providing false information on the application, failure to pay the permit fee, conviction of certain crimes within a specified time period by permit applicant or spouse, or being in current violation of the ordinance. *See* § 20–122(b)(1) and (b)(3). Disabling factors that constitute grounds for suspension include failure to comply with enumerated sections of the ordinance, excessive use of alcohol on the premises, refusal of inspections, and knowingly permitting gambling on the premises. *See* § 20–123(a). Grounds for revocation include: providing false or misleading information on the application, permitting the possession, use or sales of controlled substances on the premises, allowing prostitution on the premises, operating while the permit is suspended, conviction of an enumerated offense, allowing sex on the premises, delinquency in taxes related to the business, or if an employee or independent contractor of the operator has been convicted twice in the past twelve months of committing certain enumerated crimes on the premises. *See* § 123(b).

**228**

I(B)(2), plaintiffs have no standing to challenge the disabling provisions for permit issuance, suspension or revocation. We, therefore, vacate that portion of the District Court's opinion that holds otherwise.

## II. *The Zoning Regulations*

The ordinance regulates the location of sexually oriented businesses. Such businesses may not locate within 1500 feet of a church, an elementary or secondary school, a boundary of a residential or landmark district, a public park, a property line of a lot devoted to residential use, or another sexually oriented business. *See* § 20–126(a) and (b). Any sexually oriented business that is operating in violation of the zoning provisions at the time of the ordinance's enactment is deemed a nonconforming use. *See* § 20–126(f). The ordinance contains an "amortization" provision that permits the nonconforming use to continue for not more than one year. *Id.* The District Court held that this "amortization" provision was contrary to both Tennessee law and the city charter. Section 156 of the city charter, codified in chapter 165 of the Private Acts of 1921, provides:

> The lawful use of a premises existing at the time of adoption of an ordinance under the provisions of this Act, although such use does not conform to the provisions of such ordinance, may be continued; but if such nonconforming use is discontinued, any future use of said premises shall be in conformity with provisions of ordinances and regulations adopted under the authority of this Act.

Section 13–7–208(b) of the Tennessee Code also provides that in the event of a change in zoning restrictions:

> any industrial, commercial or business establishment in operation, permitted to operate under zoning regulations or exceptions thereto prior to the zoning change shall be allowed to continue in operation and be permitted; provided, that no change in the use of the land is undertaken by such industry or business.

This provision applies to municipal zoning insofar as it is consistent with the relevant municipal (private) act. *See* Tenn.Code Ann. § 13–7–210. The District Court concluded that the city charter and state law were consistent, and that the amortization provision was in violation of both.

Defendants argue that the "may be continued" language in the city charter refers to the city's authority to allow nonconforming uses to continue, and does not give an entity engaged in a nonconforming use the right to continue the nonconforming use. Because section 13–7–208 of the Tennessee Code was not intended to preempt inconsistent municipal zoning, defendants reason that the city charter alone applies. Defendants, however, fail to provide any support for their novel reading of the city charter. Indeed, defendants point to sections of the city's zoning code that only confirm the District Court's interpretation of the city charter.[7] The District Court's grant of summary judgment, therefore, is affirmed.

## III. *Conclusion*

Accordingly, the District Court's judgment is AFFIRMED in part, REVERSED in part, and VACATED in part. We remand for further proceedings consistent with this opinion.

---

7. Section 30 of the City zoning code states that nonconforming uses are allowed to continue, subject to certain constraints such as prohibitions on expanding.