*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 11a0091p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

BIG DIPPER ENTERTAINMENT, L.L.C.;
AQUARIUS INVESTMENTS, L.L.C.,
                            *Plaintiffs-Appellants,*

       *v.*

CITY OF WARREN,
                            *Defendant-Appellee.*

No. 09-2339

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-14716—Sean F. Cox, District Judge.

Argued: January 12, 2011

Decided and Filed: April 13, 2011

Before: NORRIS, COLE, and KETHLEDGE, Circuit Judges.

————————————

**COUNSEL**

**ARGUED:** Susan Leigh Brown, SCHWARTZ LAW FIRM, P.C., Farmington Hills, Michigan, for Appellants. Raechel M. Badalamenti, KIRK & HUTH, P.C., Clinton Township, Michigan, for Appellee. **ON BRIEF:** Susan Leigh Brown, Jay A. Schwartz, SCHWARTZ LAW FIRM, P.C., Farmington Hills, Michigan, for Appellants. Raechel M. Badalamenti, Robert S. Huth, Jr., KIRK & HUTH, P.C., Clinton Township, Michigan, for Appellee.

     KETHLEDGE, J., delivered the opinion of the court, in which NORRIS, J., joined. COLE, J. (pp. 12–18), delivered a separate dissenting opinion.

————————————

**OPINION**

————————————

     KETHLEDGE, Circuit Judge. Big Dipper Entertainment and Aquarius Investments (collectively, "Big Dipper") brought this § 1983 action against the city of

Warren, Michigan, challenging certain ordinances that regulate the licensing and location of sexually oriented businesses. The district court granted Warren's motion for summary judgment. On appeal, Big Dipper argues primarily that Warren's restrictions upon the location of adult businesses are unconstitutional. We disagree, and affirm.

I.

On October 11, 2005, the Warren city council amended the city code to restrict the location of adult businesses as follows:

> The site for the sexually oriented business must be located more than seven hundred fifty (750) feet from the nearest lot line [of] any of the following zoning districts: R-1-A, R-1-B, R-1-C, R-1-P, R-2, R-3, R-3-A, R-4, R-5, any mixed residential zone such as Planned Unit Development or the Downtown District.

Warren, Mich., Code, Zoning App'x art. XIV, § 14.01(s).

On February 1, 2006, Warren published a notice of intent to amend § 14.01(s) once again, this time to "prohibit[] the location of sexually oriented businesses within the boundaries of the Warren Downtown Development Authority." To maintain the status quo during consideration of the proposed amendment, the city council temporarily barred the issuance of new licenses for adult businesses in the downtown Warren area. The temporary bar took effect on February 15, 2006.

On February 14, Big Dipper's sole owner, Timothy Sosnovske, delivered to the Warren city clerk an application for a sexually oriented business license. The application sought permission to operate a topless bar on a parcel of land located at 7001 Convention Boulevard in Warren. Per the city code, the clerk was supposed to act on the application within 20 days. The clerk took 24 days to reject Big Dipper's application.

On March 28, 2006, the city council added the following language to § 14.01(s):

> To be consistent with the objective and stated purpose of the Downtown Development Authority Ordinance, Sec. 2-108 et seq., sexually oriented businesses as defined in Chapter 6 of the Code of Ordinances shall be

prohibited from locating within the Downtown Development District boundaries as described by Chapter 2 of the Code of Ordinances.

As so amended, § 14.01(s) encompasses the 7001 Convention property.

Almost two years later, Big Dipper filed this § 1983 action in federal district court. It claimed that the October 2005 and March 2006 amendments to § 14.01(s) violate the First Amendment and that Warren's untimely (by four days) rejection of its application acted as a prior restraint upon protected expression. Warren moved for summary judgment as to both claims. The district court granted the motion. This appeal followed.

## II.

We review the district court's grant of summary judgment de novo, viewing the facts in the light most favorable to Big Dipper. *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006).

## A.

Big Dipper claims that § 14.01(s), as amended, is an unconstitutional restriction upon speech. As an initial matter, the speech at issue here is that conveyed by a topless bar; and in a democracy, it is only common sense to say that "society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate[.]" *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 70 (1976) (Stevens, J., plurality opinion); *see also Bronco's Entertainment, Ltd. v. Charter Township of Van Buren*, 421 F.3d 440, 447 (6th Cir. 2005) (same). Democracies need political debate more than they do topless bars in order to function.

The caselaw reflects that reality. Normally a content-based restriction on speech is subject to strict scrutiny. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382-83, 395 (1992). But zoning ordinances that regulate adult businesses—which typically on their face are content-based—are treated differently. So long as they aim to limit the secondary effects of adult businesses, we treat the ordinances as content-neutral, which means they get less scrutiny. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 49

(1986). So the question whether § 14.01(s) is aimed at secondary effects is the first one we address here.

Big Dipper says the ordinance was not so aimed. In Big Dipper's view, the real reason that Warren amended § 14.01(s) was not to limit the secondary effects of adult businesses, but simply to prevent new ones from opening there. This is a difficult claim on which to prevail. "'It is a familiar principle of constitutional law that [courts] will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.'" *Id.* at 48 (quoting *United States v. O'Brien*, 391 U.S. 367, 383 (1968)). A corollary of that principle is that a city need only show that its "*predominate* concerns were with the secondary effects" of adult businesses in order to defeat a claim of illicit motive. *Id.* at 47 (emphasis in original; internal quotation marks omitted).

Warren has made that showing here. The city council received no less than 49 studies and reports concerning the secondary effects of adult businesses before enacting the October 2005 amendments to its ordinance. Those reports remained valid for purposes of the March 2006 amendment. The council's minutes of its February 14, 2006 meeting contain discussion about limiting secondary effects and avoiding blight and deterioration in the city. And the council passed a resolution stating that the March 2006 amendment was intended to "halt[] property value deterioration," "eliminate the causes of deterioration" and "eliminate blight."

It is true, as Big Dipper points out, that, during debate on the amendments, some city-council members made comments that suggested they were hostile to adult businesses. But at most those comments show that, for those members at least, a desire to restrict adult businesses' speech was "a motivating factor in enacting the ordinance," *id.*; and that is precisely the showing the Supreme Court says is *not* sufficient to trigger heightened scrutiny of this type of ordinance. *See id.* As a whole, therefore, the record in this case establishes that the amendments to § 14.01 are content-neutral for purposes of our analysis here.

Thus, "[t]he appropriate inquiry in this case," as in *Renton*, is whether the "ordinance is designed to serve a substantial government interest and allows for

reasonable alternative avenues of communication." *Id*. at 50. The district court applied this same test and held that the ordinance passed it.

Although this test has discrete aspects, Big Dipper for the most part does not explain in its appellate briefs how particular aspects of the test were not met here. For example, as we read its briefs, Big Dipper does not argue that controlling secondary effects is not a substantial government interest, or that the city council lacked an empirical basis to conclude that § 14.01(s) furthers that interest. Big Dipper does say in conclusory terms that §14.01(s) is not "narrowly tailored," but we do not see how narrow tailoring is much of an issue in this case. Narrow tailoring typically arises as an issue in these cases when the ordinance is sloppily drafted, so that by its terms the ordinance would reach, say, mainstream bookstores that sell *Lady Chatterley's Lover*. *See, e.g.*, *Executive Arts Studio, Inc. v. City of Grand Rapids*, 391 F.3d 783, 796-97 (6th Cir. 2004). Big Dipper makes no such argument here.

What Big Dipper does argue (sometimes under the heading of narrow tailoring, sometimes not) is that the amended § 14.01(s) is too broad in geographic scope— i.e., that it leaves too few sites available for adult businesses in the city. This argument goes to "the question whether the [Warren] ordinance allows for reasonable alternative avenues of communication." *Renton*, 475 U.S. at 53. Big Dipper seeks to draw from the caselaw some minimum percentage or number of acres that the city must leave open to adult businesses, regardless of the other circumstances in the case. The district court took a more grounded approach, measuring, among other things, the demand for adult-business locations in Warren against the supply available under the amended §14.01(s). And having done so, the district court held that the supply was adequate.

The district court's methodology was sound. As the Supreme Court has explained, the question with respect to the adequacy of available sites is simply whether the ordinance denies the "[plaintiff]s a reasonable opportunity to open and operate an adult [business] within the city[.]" *Id*. at 54. That question does not turn on arbitrary percentages or formulas. Depending on the facts of the case, of course, percentages or formulas can be relevant to the outcome; but that does not mean that the same percentage

or formula governs in every case. The First Amendment does not prescribe a Uniform Zoning Code.

Instead, the *Renton* question, by its terms, is fact-intensive. *See Christy v. City of Ann Arbor*, 824 F.2d 489, 491 (6th Cir. 1987) ("each case must be decided according to its specific facts"). One of the relevant facts is demand: whether a certain number of sites affords a plaintiff a "reasonable opportunity" to open an adult business depends, in part, on how many other potential adult businesses seek to crowd in on those sites. The record in this case, unlike some others, contains that information. The district court was right to consider it. *Accord Young v. City of Simi Valley*, 216 F.3d 807, 822 (9th Cir. 2000); *Boss Capital, Inc. v. City of Casselberry*, 187 F.3d 1251, 1254 (11th Cir. 1999); *Buzzetti v. City of New York*, 140 F.3d 134, 140-41 (2d Cir. 1998); *North Ave. Novelties, Inc. v. City of Chicago*, 88 F.3d 441, 445 (7th Cir. 1996); *Woodall v. City of El Paso*, 49 F.3d 1120, 1126-27 (5th Cir. 1995).

We turn to the district court's application of this methodology. The court began its analysis by finding that the amended § 14.01(s) left a total of 39 sites available to Big Dipper's business. (The 7001 Convention Boulevard site was not among them.) Big Dipper criticizes that finding in notably harsh terms, asserting that the district court "made no pretense" of applying the proper summary-judgment standard, that the court's analysis of the issue (in a 32-page opinion) was "cursory," that the court "chose to disregard" the "voluminous and detailed analysis" set forth in the report of Big Dipper's expert, Bruce McLaughlin, and so on. (Big Dipper similarly accuses opposing counsel of making "egregious misstatement[s]" to this court, etc.)

Arguments like these—which casually impugn the motives of the district court or, more commonly, opposing counsel—are regrettably common of late. So we think it worthwhile to comment on them. In our view, a party should think twice about questioning the district court's integrity or that of opposing counsel. That two persons disagree does not mean that one of them has bad motives. And even in the worst cases, the better practice is usually to lay out the facts and let the court reach its own conclusions.

In any event, Big Dipper cannot back up its charges here. Stripped of hyperbole, Big Dipper's argument is that various aspects of McLaughlin's analysis show that § 14.01(s), as amended, restricts Big Dipper to less than 10 potential sites, rather than 39. And Big Dipper says the district court disregarded these aspects of McLaughlin's analysis in granting summary judgment to the city. The problem with this argument is that, in the district court, Big Dipper did not discuss these aspects of McLaughlin's analysis any more than the district court did. We have reviewed Big Dipper's briefs in support of its own motion for summary judgment and in opposition to the City's motion; and nowhere in those briefs does Big Dipper argue that the number of sites available to it should be reduced from 39 based on McLaughlin's analysis in his expert report. Big Dipper discusses McLaughlin's report in support of other arguments, but not in support of the less-than-39 one.

To create a genuine issue of material fact, a party must do more than file an expert report with the district court. It was Big Dipper's job, not the district court's, to present argument as to *how* McLaughlin's report created genuine issues of material fact as to the number of sites available to Big Dipper's business. Big Dipper did not make those arguments in the district court, and it cannot make them now. Big Dipper's arguments as to how McLaughlin's report supports a sites-available number of less than 39 are waived. *See Sigmon Fuel Co. v. Tennessee Valley Auth.*, 754 F.2d 162, 164-65 (6th Cir. 1985).

That leaves two arguments that Big Dipper did make in the district court with respect to the number of sites available to it. First, according to Big Dipper, Warren's zoning ordinances require industrial lots zoned M-2—that is, all of the 39 lots at issue here—to have a minimum area of 20,000 square feet. Twelve of the 39 sites here are smaller than 20,000 square feet. Big Dipper argues that those 12 sites should be subtracted from the number deemed available. We think Big Dipper has created a genuine issue of fact on that point. For purposes of our analysis, therefore, we reduce the number of sites available from 39 to 27.

Second, Big Dipper argues that the city's parking requirements should reduce the number still further. According to Big Dipper, the city requires dance halls to provide one parking space per every 100 square feet of dance floor. Big Dipper does not elaborate as to how, exactly, this provision would affect it; but in any event the provision could only require Big Dipper to build a smaller dance floor than otherwise. That is a commercial concern, not a constitutional one; and "the Supreme Court has made clear that alternative sites need not be viable commercial properties." *Bronco's Entertainment*, 421 F.3d at 452.

The same rule disposes of a related contention, which is that the city's expert report requires us to trim 14 sites from the district court's total. But we have already eliminated some of those 14 sites based on the 20,000 square-foot rule. The expert rejected the remainder of them based on commercial considerations, which are again irrelevant for our purposes. *Id.*

So we are left with 27 as the number of sites available for Big Dipper's business. Meanwhile, it is undisputed that a total of two applications for adult businesses were filed in the city of Warren during the five years leading up to this lawsuit. That fact makes this case different from others on which Big Dipper relies. A supply of sites more than 13 times greater than the five-year demand is more than ample for constitutional purposes. The district court was correct to grant summary judgment on this claim.

B.

We make shorter work of Big Dipper's remaining claim. In Big Dipper's view, the city violated the First Amendment—by imposing a prior restraint on Big Dipper's speech—when the city took 24 days, rather than 20 as prescribed by the city's rules, to reject Big Dipper's application. Big Dipper also contends that the city did not comply with other miscellanea in its licensing rules, which in its view compounds the constitutional violation.

The sort of licensing regime at issue here must contain two procedural safeguards to be constitutional. First, the city must make its decision whether to issue the license

"within a specified and reasonable time period during which the status quo is maintained[.]" *East Brooks Books, Inc. v. City of Memphis*, 48 F.3d 220, 224 (6th Cir. 1995) (internal quotation marks omitted).  Second, the applicant must be able to obtain prompt judicial review.  *Id.*

Big Dipper's claim is meritless for the reasons recited by the district court.  That the city took 24 days rather than 20 to act on Big Dipper's application is immaterial for constitutional purposes.  *See Bronco's Entertainment*, 421 F.3d at 448 (holding that a 44-day period for acting upon the same kind of application was "sufficiently brief").  Moreover, the city maintained the status quo while the application was pending.  *See East Brooks Books*, 48 F.3d at 225.  Finally, Big Dipper could have obtained prompt judicial review of the March 2006 licensing decision, but instead chose to do nothing for 20 months before filing this suit in the district court.  *See Deja Vu of Cincinnati, L.L.C. v. Union Township Board of Trustees*, 411 F.3d 777, 787-88 (6th Cir. 2005).  That, in our view, should be the end of any claim that Big Dipper was denied prompt judicial review.

The dissent would grant relief on such a claim nonetheless.  In the dissent's view, Big Dipper's right to prompt judicial review was violated here, notwithstanding Big Dipper's own inaction for 20 months, because (the dissent says) it was Warren's obligation rather than Big Dipper's to initiate a lawsuit regarding the denial.  Thus, the dissent suggests, "the beaches of Normandy" in this case lie with the prior-restraint claim.  Dissent at 12.

Where the dissent actually finds itself, however, is at Pas de Calais.  As an initial matter, the district court did not address the prompt-judicial-review argument now made by the dissent, for the simple reason that Big Dipper did not make it there.  Big Dipper did briefly mention the existence of its right to prompt judicial review in its summary-judgment briefing in the district court.  But nowhere did Big Dipper argue that this particular right was violated, much less for the reason that it was Warren's obligation rather than Big Dipper's own to file this lawsuit.  (We also have our doubts as to whether Big Dipper has even raised the prompt-judicial-review argument before us, but given the

Rorschach quality of the briefing on this claim, we do not press the point.)  Thus, the argument that Warren imposed a prior restraint upon Big Dipper by denying it prompt judicial review is waived.  *See Barany-Snyder v. Weiner*, 539 F.3d 327, 332 (6th Cir. 2008).

The argument is meritless as well.  The dissent is simply mistaken in asserting that it was Warren's burden rather than Big Dipper's to file a lawsuit with respect to the denied application.  In *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990), a three-Justice plurality specifically "conclude[d] that the First Amendment does not require that the city bear the burden of going to court to effect the denial of a license application or that it bear the burden of proof once in court."  *Id.* at 227 (O'Connor, J., plurality opinion).  Three other Justices agreed with the plurality on that point.  *See id.* at 244 (White, J., joined by Rehnquist, C.J., concurring and dissenting); *id.* at 253 (Scalia, J., concurring and dissenting).  The rule cited by the dissent here applies to censorship cases, not licensing ones; and the case that the dissent cites in support of its putative burden-shifting tacitly admits as much.  *See Deja Vu of Nashville, Inc. v. Metro Gov't of Nashville and Davidson County*, 274 F.3d 377, 401 n.5 (6th Cir. 2001); *see also Odle v. Decatur County*, 421 F.3d 386, 390 (6th Cir. 2005) ("In the seminal *Freedman* decision, the Supreme Court suggested that a licensing scheme must place the burden of proof as to whether an applicant's form of expression is protected on the government.  However, [after *FW/PBS*] it now appears that prompt judicial review and preservation of the status quo are the only constitutionally indispensable procedural safeguards" (internal citations omitted)).  When six Justices agree on a legal proposition, we are not free to disagree for purposes of our decision.

The relevant safeguard, then, is that "there must be an assurance that a judicial decision, *if sought by the applicant*, can be obtained seasonably."  *Bronco's Entertainment*, 421 F.3d at 444 (emphasis added).  Big Dipper challenges Warren's licensing regime as applied to the facts of this case, rather than facially.  And the undisputed fact remains that Big Dipper took 20 months to seek "prompt judicial review."  That is the only delay at issue here.  It is true that Warren did not notify Big

Dipper of its right to seek judicial review, and that Warren did not commence an administrative hearing with respect to its denial of Big Dipper's application. Neither of those omissions is commendable, but neither is a constitutional violation either. Nor do those omissions serve to tag Warren with responsibility for Big Dipper's delay in bringing suit. Big Dipper's actions throughout the application process demonstrate that it was acutely aware of its rights under the subject ordinance. And—as the existence of this lawsuit itself demonstrates—there was nothing in the licensing regime that prevented Big Dipper from seeking judicial review of Warren's denial of its application. To the contrary, the ordinance states that, "[i]f any court action challenging the city's decision or the hearing officer's decision is initiated, the city shall: 1) consent to expedited briefing and/or disposition of the action, 2) comply with any expedited schedule set by the court, and 3) facilitate prompt judicial review of the proceedings." Warren Code art. X, § 6-299.

Finally, the dissent is again mistaken in suggesting that "judicial review" means "administrative review" for purposes of our prior-restraint analysis. *See* Dissent at 14-15. Although, as a factual matter, the cases cited by the dissent did involve ordinances that provided for administrative as well as judicial review, the holdings of those cases provide no support for conflating these different types of review. And the only kind of prompt review that the cases require is "judicial[.]" *Bronco's Entertainment*, 421 F.3d at 444.

The reality is that Big Dipper could have brought this lawsuit much sooner than it did. The only delay in obtaining judicial review was its own. Big Dipper's claim—to the extent it even makes the claim—that it was denied prompt judicial review of its application is meritless.

The district court's judgment is affirmed.

---

**DISSENT**

---

COLE, Circuit Judge, dissenting.  The majority spends the bulk of its time tearing down Big Dipper's arguments on the constitutionality of Warren's geographic restrictions on sexually oriented businesses.  But the beaches of Normandy lie elsewhere: the prior restraint analysis.  For, as applied here, Warren's licensing scheme functioned as a prior restraint that did not provide for "prompt judicial review."  *See Odle v. Decatur Cnty.*, 421 F.3d 386, 389-90 (6th Cir. 2005).  As such, Warren's scheme was unconstitutional and could not be used to reject Big Dipper's application.

The majority finds Big Dipper's prompt-judicial-review argument waived.  However, the majority's waiver analysis is misguided.  As the majority admits, Big Dipper made its prior restraint argument—including claiming it did not receive prompt judicial review—in its motion for summary judgment before the district court, and again before us.  Specifically, Big Dipper noted that "the decision whether to issue a license must be made within a specified, brief time period . . . and [] there must be assurance that a judicial decision, if sought by an applicant, can be obtained seasonably."  (Big Dipper's Motion for Summary Judgment on Liability, Dist. Ct. Docket No. 32, at 28-29.)  It then argued that the "letter of intent to deny must apprise the applicant of his right to a hearing before the Administrative Hearing board within 20 days . . . [, and f]ailing the delivery of a timely letter of intent to deny, the ordinance itself states that the applicant is deemed to have met all conditions of licensure," but that Warren failed to provide such review.  (*Id.* at 29.)  Big Dipper repeated this argument before us.  (*See* Big Dipper Br. 56-63.)

The fact that Big Dipper made its argument in its initial motion for summary judgment and preserved that argument here renders *Barany-Snyder*—the case on which the majority relies—and the waiver cases cited therein inapposite, for they deal with arguments that a party has not raised below, has raised below only in reply briefs, or has mentioned before the court of appeals merely "in the most skeletal way, leaving the court

to . . . put flesh on its bones," *McPherson v. Kelsey*, 125 F.3d 989, 996 (6th Cir. 1997) (internal quotation mark omitted) (ellipses in original). *See Barany-Snyder v. Weiner*, 539 F.3d 327, 331 (6th Cir. 2008). These circumstances are a far cry from this case. Big Dipper's prompt-judicial-review argument is not waived.

Turning to the merits, I note first that a licensing scheme like Warren's, which requires approval before sexually oriented speech may take place, constitutes a prior restraint, and is presumptively unconstitutional. *See Bronco's Entm't, L.T.D. v. Charter Twp. of Van Buren*, 421 F.3d 440, 444 (6th Cir. 2005). Such a scheme survives constitutional attack only if it at least preserves the status quo and ensures "prompt judicial review." *Odle*, 421 F.3d at 389-90. I agree with the majority that Warren adequately preserved the status quo. The question is whether Warren provided Big Dipper with "prompt judicial review."

Promptness is required for both the time taken to approve or deny the license and the period between the denial and review of that decision. *Bronco's Entm't*, 421 F.3d at 444, 448. The first of these two is not problematic here, for Warren denied Big Dipper's application only twenty-four days after its submission, and courts have found even longer delays constitutional. *See City of Littleton v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774, 778, 781 (2004) (finding forty days not to be too long); *Bronco's Entm't*, 421 F.3d at 448 (finding forty-four days not to be too long).

The second promptness requirement, however, poses much greater problems for Warren. The license denial letter sent to Big Dipper did not indicate the specific reason for the denial—stating only that the application was "defective and not the proper application"—and did not apprise Big Dipper of the ability to appeal the denial.[1] (*See* First Denial Letter, Dist. Ct. Docket No. 59-10 (Ex. H).) Under Warren's ordinances, however:

---

[1]Big Dipper later submitted a revised license application. Warren denied that license as well, *also* while failing to indicate Big Dipper's right to a hearing or other judicial review. (*See* Second Denial Letter, Dist. Ct. Docket No. 42-8 (Ex. 81).) Once might be a mistake, but twice is a pattern.

> [w]hen the city clerk issues a written notice of intent to deny . . . a license, . . . [t]he notice shall specify the location and the date, not less than ten (10) days nor more than twenty (20) days after the date the notice is issued, on which the hearing officer shall conduct a hearing on the city clerk's intent to deny . . . the license.
>
>     . . . The hearing shall take no longer than two (2) consecutive days, unless extended at the request of the respondent . . . . The hearing officer shall issue a written decision . . . to the parties within five (5) days after the hearing. Either party may appeal such decision to a court of competent jurisdiction.

(City of Warren Code of Ordinances, Ordinance 80-621, art. X, § 6-299(a), Dist. Ct. Docket No. 59-7 (Ex. E).) And Warren's justification for rejecting the application is immaterial, for whether the application fell short due to notarization, proper location, or otherwise, a denial is a denial. The point of *review* is to ascertain whether the reason for the denial was proper.

Warren's codified review procedure ensures "prompt judicial review" in theory, so Big Dipper's facial attack on the scheme must fail. But Warren ignored this procedure here, and the constitutionality of sexually-oriented-business licensing depends on "an assurance that a judicial decision [reviewing the license denial], if sought by the applicant, can be obtained seasonally." *Bronco's Entm't*, 421 F.3d at 444. In *Bronco's Entertainment*, we found municipal provision of two levels of judicial review, each coupled with a public hearing, along with subsequent court review of the ultimate decision, to be adequate to ensure prompt judicial review. *Id.* at 446-47; *see also Richland Bookmart, Inc. v. Knox Cnty.*, 555 F.3d 512, 533 (6th Cir. 2009) (finding prompt judicial review satisfied by several levels of immediate review of a licensing decision); *Odle*, 421 F.3d at 390-91 (same). By contrast, we have found the possibility of *discretionary* judicial review insufficient to constitute "prompt judicial review." *See Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson Cnty.*, 274 F.3d 377, 401 (6th Cir. 2001).

The circumstances here are even more egregious than those in *Deja Vu* given the utter lack of direct judicial review (until the separate filing of this case), let alone prompt and non-discretionary review. Meanwhile, in stark contrast to the case law, the majority

finds no need for "prompt judicial review" because of the twenty-month period between the license denial and Big Dipper filing suit. Yet, as shown above, the relevant "judicial review" in the prior-restraint context is *not* simply the filing of suit in federal court, but an administrative structure that a city must have in place *and then use*. *See Richland Bookmart*, 555 F.3d at 533; *Bronco's Entm't*, 421 F.3d at 446-47; *Odle*, 421 F.3d at 390-91; *Deja Vu of Nashville*, 274 F.3d at 401. And the Supreme Court has indicated that "the burden of instituting judicial proceedings and proving that expression is unprotected" falls on the city, not the license seeker. *Deja Vu of Nashville*, 274 F.3d at 400 (citing *Freedman v. Maryland*, 380 U.S. 51, 58 (1965)). Warren did no such thing, so it did not provide Big Dipper with its constitutional entitlement to "prompt judicial review."[2]

In dicta, the majority struggles against our precedent. Realizing that it must find a handhold above our circuit, it grasps for the Supreme Court's fractured opinion in *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990). That opinion, however, does not provide the majority sanctuary. The majority claims that six Justices agreed that "the First Amendment does not require that the city bear the burden of going to court to effect the denial of a license application or that it bear the burden of proof once in court." Slip Op. at 10 (quoting *FW/PBS*, 493 U.S. at 227 (O'Connor, J., joined by Stevens and Kennedy, JJ., plurality)). This statement is incorrect and misses the point, but a bit of context is necessary to ground that discussion.

In *Freedman*, the Supreme Court held that statutory systems requiring permission before speech occurs constitute unconstitutional prior restraints unless: 1) the systems restrain speech prior to judicial review only for a brief period during which they preserve the status quo; 2) the systems provide prompt judicial review; and 3) the city goes to

---

[2]This absolute disregard for reviewing the denial of Big Dipper's license is made all the worse because, under Warren's ordinances, Warren was under a duty to *grant* Big Dipper's license when it took longer than twenty days to approve or deny it. (*See* City of Warren Code of Ordinances, Ordinance 80-621, art. X, §§ 6-285(a) (requiring Warren to act on a license application within twenty days) and 6-290 (deeming Warren's failure to act on an application within the time stated in Warren's ordinances to constitute Warren's approval of that license application), Dist. Ct. Docket No. 59-7 (Ex. E).) Further, there is no exception for "incomplete" or "non-notarized" applications, so that argument does nothing for Warren.

court to suppress the speech and bears the burden of proof there.  380 U.S. at 58-60.  The Court reviewed the three *Freedman* factors in *FW/PBS*, and a majority held the Dallas scheme at issue there unconstitutional for its failure to impose strict administrative time limits.  493 U.S. at 229 (O'Connor, J., plurality); *id.* at 238-39 (Brennan, J., joined by Marshall and Blackmun, JJ., concurring in the judgment).  Three Justices believed only the first two *Freedman* factors applied, *id.* at 229 (O'Connor, J., plurality), three Justices believed all the *Freedman* factors applied, *id.* at 238-39 (Brennan J., concurring in the judgment), and three Justices believed the *Freedman* test was inapplicable, *id.* at 244-45 (White, J., joined by Rehnquist, C.J., concurring in part and dissenting in part); *id.* at 253 (Scalia, J., concurring in part and dissenting in part).

With that background, I explain why the majority's interpretation of *FW/PBS* is incorrect.  First, six Justices did *not* agree with the *FW/PBS* plurality position cited by the majority here.  Justice White's partial concurrence and partial dissent, joined by Chief Justice Rehnquist, did not coincide with the plurality's perspective that, though the *Freedman* analysis applied generally, the last factor was not constitutionally required; instead, Justice White and Chief Justice Rehnquist believed that the *Freedman* analysis was entirely irrelevant.  *FW/PBS*, 493 U.S. at 244-45 (White, J., concurring in part and dissenting in part).  Justice White's opinion saw the Dallas ordinances as merely time, place, and manner restrictions to be upheld accordingly so long as they did not allow "[u]nbridled discretion," which the two Justices believed the restrictions did not. *Id.* at 246.  This position does not overlap with the plurality.  And Justice Scalia's partial concurrence and partial dissent is even further afield:  He did not believe the First Amendment limited the Dallas ordinances at all.  *Id.* at 253 (Scalia, J., concurring in part and dissenting in part) ("Because I think that Dallas could constitutionally have proscribed the commercial activities that it chose instead to license, I do not think the details of its licensing scheme had to comply with First Amendment standards.").  In sum, the majority misreads *FW/PBS*.

Second, the statement from the plurality opinion that the majority cites—about the third *Freedman* factor—is "dicta[,] because it is not necessary . . . to reach a decision

in th[e] case." *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 558 (6th Cir. 2010). That is because the plurality would "hold that the failure to provide the[] essential safeguards [of the first two *Freedman* factors] renders the ordinance's licensing requirement unconstitutional." *FW/PBS*, 493 U.S. at 229 (O'Connor, J., plurality). The plurality's discussion of the third factor was thus superfluous, and the Court has implicitly recognized as much subsequently. *See City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 281 (2001).

Third, the plurality's statement, were it endorsed by at least two other Justices and were it not dicta, is not the categorical rule that the majority here claims it is. Instead, the plurality's rule examined the specific restrictions of the Dallas licensing scheme before suggesting that Dallas need not go to court to defend its scheme. *Id.* at 229-30; *cf. City of Littleton*, 541 U.S. at 781-83 (highlighting the individualized determination of what First Amendment strictures govern any particular city ordinance serving as a prior restraint). This same fact, meanwhile, demonstrates why the majority's statement that "[t]he rule cited by the dissent here applies to censorship cases, not licensing ones," is simply incorrect: The "rule" is part of *Freedman*'s prior-restraint analysis, which the Court has applied to licensing as well as "censorship," if one may even draw such a distinction. *See City of Littleton*, 541 U.S. at 778-80; *City News & Novelty*, 531 U.S. at 280-81.

Additionally, and most importantly, even were the majority's statement accurate—which it is not—it misses the point. The plurality's discussion in *FW/PBS* deals with the third *Freedman* factor regarding initiation of litigation, not the separate requirement for prompt judicial review. *FW/PBS*, 493 U.S. at 227-29 (O'Connor, J., plurality). And while these requirements may align, they do not merge. Perhaps realizing as much, the majority suggests prompt judicial review encompasses solely "judicial," presumably meaning federal or state court, as opposed to "administrative," review. Slip Op. at 11. However, "*Freedman*'s 'judicial review' safeguard is meant to prevent undue delay, [which] include[s] *judicial*, as well as *administrative*, delay." *City of Littleton*, 541 U.S. at 781 (emphasis in original) (internal quotation marks and citation

omitted); *cf. Thomas v. Chicago Park Dist.*, 534 U.S. 316, 324 (2002) (pointing to *administrative* review procedures to demonstrate the availability of review of a licensing board's decision based on a content-neutral time, place, and manner restriction). Moreover, because our precedent has invalidated systems for lack of prompt judicial review (under the First Amendment) where sexually-oriented business owners could obtain not only court review, but some administrative review as well, systems that accord no administrative review, *a fortiori*, must fail under First Amendment scrutiny. *See Deja Vu of Nashville*, 274 F.3d at 401. Contrary to the majority's statement, therefore, a city must promptly provide both court and administrative review for a sexually oriented licensing system to be a permissible prior restraint under the First Amendment. Warren did not do so, so its licensing scheme is an unconstitutional prior restraint as applied here. I respectfully dissent.